UNITED STATES OF AMERICA
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


UNITED STATES OF AMERICA

    v.          CASE NO.  8:07-cr-342-T-23-MAP

AHMED ABDELLATIF SHERIF MOHAMED
YOUSSEF SAMIR MEGAHED
_____/

## <u>REPORT AND RECOMMENDATION</u>

  Both Defendants move to suppress evidence seized and statements made after a traffic stop claiming the officer lacked probable cause to effect the stop, unreasonably detained them longer than needed to complete the traffic inquiry, and searched their automobile without their consent (docs. 76, 102, and 106).  After a suppression hearing, I recommend their motions be denied because the officer had probable cause to stop the Defendants for speeding, the brief questioning of the Defendants was not unreasonable in scope nor duration, and the driver consented to the search.[1]

  *A. Facts*

  On August 4, 2007, Corporal James Lamar Blakely of the Berkeley County, South Carolina Sheriff's Office spotted a silver Toyota bearing a Florida tag heading north on Highway 176 away from Goose Creek.  Blakely followed in his marked cruiser for a distance, noticed the driver looking at him in the rear view mirror, and the passenger looking down.  As it passed a Wal-Mart, the Toyota sped up to a rate of 60 miles per hour in a posted 45 miles per hour zone.  Blakely

---

[1]  The district judge referred the matter to me with directions to conduct such hearings as necessary and to issue a report and recommendation (doc. 77).

activated his blue lights signaling he intended to stop the Toyota for the infraction.[2]   Despite opportunities to safely pull off the highway, the Toyota's driver continued for about a mile before stopping on the highway's shoulder.  Blakely could see the two quickly reach toward the center console as if moving or hiding something.  His video camera on the dash of his cruiser recorded the time – 5:30 p.m.[3]

As Blakely approached the driver (Ahmed Mohamed), he spotted the front passenger (Youssef Megahed) disconnect wires from a laptop, throw them to the back seat, abruptly shut the laptop, and sit upright.  The corporal asked for Mohamed's license, registration, and proof of insurance.  When Mohamed produced a temporary foreign driver's license but could not present any registration, Megahed explained his brother, Yahia, owned the car.  Joined by another deputy (Andy Taylor), Blakely also secured Megahed's license and informed Mohamed that Mohamed had been speeding.  Blakely and Taylor next returned to Blakely's cruiser and called dispatch for confirmation of the licenses.

After this two-minute encounter, Blakely and Taylor conferred away from Mohamed and Megahed and pondered the obvious: the two young men were likely from the Middle East; they

---

[2]  Blakely served in the Berkely County Sheriff's selective enforcement team, a unit that patrolled high crime areas.  His cruiser was not the typical Ford Crown Victoria with the bubble lights or strobe bar affixed to the roof.  Instead, its strobe lights were mounted within the front grill and inside the cab near the roof line with the sheriff's star on its door sides.  Nothing in the record suggests the Defendants failed to recognize Blakely's show of police authority.

[3]  The camera automatically begins recording three seconds after the officer triggers his lights.  Blakely also wore a portable microphone to record his conversations with the driver and passenger.  The parties agree that Defendant Megahed's exhibit #8 represents a sufficiently accurate representation of the speakers' recorded statements.  References to that transcript will be made by the symbol, "T," followed by the time.  Although the transcript follows the tape's use of military time, for consistency within this report that time has been converted to ordinary time.

were driving in the opposite direction from the one nearby tourist destination (Charleston); they were headed north on what would be a two-lane stretch of rural highway toward no obvious point of interest; and their presence in Goose Creek did not match the officers' usual roadside encounters.[4]  Blakely and Taylor also jumped to a stereotypical assumption based on Mohamed's and Megahed's ethnicity – they were terrorists.  "Both are sitting holding Qur'ans in their laps while driving … they are Taliban … I've got Taliban bro … they've got a bomb strapped to them."  Yet, aside from these crass, baseless remarks, Blakely also articulated rational, unbiased observations:

> Blakely:   He [Megahed] started putting all kinds of stuff in the back and all.  Like when I walked up, he was pulling wires and stuff putting them in the back, because I seen the laptop (T. 5:32:39).

***

> Blakely:   Hey [speaking to someone not at the scene], now look here.  I got two guys supposed to be out of Florida, both of them are just driving – well, it took them forever to pull over, and they were digging in the console and in the back, and they don't have no registration to the vehicle.  The guy [Megahed] says it is registered to his brother, but he didn't know his brother's name … The driver [Mohamed] ain't much saying anything.  Except, I asked him why he didn't pullover, he said because the roads were slanted, but both of them are sitting holding the Qur'an in their lap while they're driving (T. 5:34:18).[5]

***

---

[4] Admittedly, only the first of these four conclusions is apparent from a review of Blakely's dashboard recording system.  While the officers did not verbalize the remaining three during their discussion in Blakely's cruiser, these deductions are readily apparent from the officers' testimony at the suppression hearing.  In short, it is fair to say the officers were thinking this at the time.

[5] Obviously, holding a Qur'an (or any religious item for that matter) while in an automobile should not arouse suspicion.  But Blakely's other observations within this quote present unbiased reasons for furthering the investigation.  Accordingly, for the sake of completeness, I have included Blakely's inappropriate comments as well as his rational observations.

Blakely:       I didn't think they were gonna stop.  Ask me how long I had my lights on – since Wal-Mart (T. 5:35:56).

After this discourse, dispatch confirmed at 5:36 p.m. that the Toyota was registered to Megahed's brother.  Notwithstanding, Blakely and those officers in communication with him returned to the same offensive rant: "maybe they're going to practice a suicide bombing here … Well he passed freakin' suicide bomber school quick … They're turning the bomb on right now  … That's for remote detonation."[6]

About ten minutes after the initial stop, Blakely wrote out a warning citation and informed his backup that he planned to get Megahed and Mohamed out of the Toyota and search it.  Blakely directed Mohamed to exit the Toyota and walk to the back of the car.  As Mohamed reached the Toyota's trunk, Mohamed turned, momentarily assumed a position as if expecting to be searched, and asked the deputies: "Are you gonna search me?"  Blakely quickly replied in a somewhat surprised tone: "I mean we can if you want us to.  I just asked you to step back here."  For about the next three minutes, the corporal asked Mohamed what he studied in school, what he was doing in South Carolina, what route he took, the locations he had passed along the way, where he stayed the night before, and when he had left Tampa.  Mohamed answered that he was "doing his Ph.D." in civil engineering; that he and Megahed were friends, fellow Egyptians, and students at the University of South Florida; that the two were headed to Sunset Beach, North Carolina; and that

---

[6]  At the suppression hearing, Blakely and Taylor characterized these comments as crude "jokes" and in retrospect recognized their comments were offensive and "unprofessional."  Despite their after-the-fact mea culpas, the two admitted they were concerned for their safety (although their reasons were mainly based on their stereotypical ethnic-based misconceptions).  Blakely's apprehension, although unwarranted, is evident from his comments: "Dude, shut up.  All right.  I don't like stopping these (expletive) anyway (T. 5:38:46) … I'm going to get him (Mohamed) out of the car; I'm gonna search his car, and you got to help me, Bill (Fields) (T. 5:39:01)."

they had left Tampa the night before (Friday night), driven all night and all day, taken I-95 much of the way, had stopped at three beaches during their excursion, and had exited I-95 to get gas at the Goose Creek Wal-Mart (a distance of about fifty miles from the I-95 exit).

After this inquiry, Blakely similarly questioned Megahed.  In contrast, Megahed confirmed much of what his partner had told Blakely except that they had left Tampa at either two or three that morning, not the previous night.  Megahed also added they had stopped at Savannah Beach and planned to continue to Sunset Beach, although they knew no one there.  Confronted with these accounts and the Defendants' circuitous, fourteen hour route, Blakely told Megahed his "story" did not make sense for several reasons: Savannah did not have a beach; "not many people" would leave Tampa at 2:00 a.m. and drive for fourteen hours when a more direct route to their destination would only take five and half hours; they could have driven to and from North Carolina in the same amount of time; and it seemed out of the ordinary to go to Sunset Beach, North Carolina without a particular reason.

About sixteen minutes after stopping the Toyota, Blakely asked Megahed if there was anything in the vehicle he should know about – "drugs, guns, knives."  Megahed said no.  Blakely handed Megahed his license, turned to question Mohamed briefly, and eventually asked the same question about the car's contents.  Mohamed looked down at the Toyota's trunk and informed Blakely would find "just fireworks, fuses" and "small homemade rockets."  Blakely countered: "Okay, you don't have a problem if I look then, right?"  When Mohamed said "Excuse me?", Blakely repeated the question: "You don't have a problem if I look then right?"  Mohamed, gesturing his arms upward, answered, "If you must."  Not satisfied that Mohamed had granted him permission to search, Blakely asked again: "You don't have a problem?"  Mohamed indicated no,

and Blakely announced, "Okay." *See* T. 5:46:39 to 5:47:21.[7] When Blakely discovered a box of ammunition, the corporal had both Defendants cuffed. A few minutes later, as Mohamed had confirmed, searching deputies found within the trunk a quantity of safety fuses, several sections of cut PVC piping containing, according to the government, a potassium nitrate explosive mixture. The government also contends a forensic analysis of the laptop computer revealed Mohamed in a video explaining how to construct a remote-controlled explosive device.[8]

### B. Discussion

#### 1. traffic-stop standards

A police officer's temporary detention of individuals during a traffic stop, "even if only for a brief period and for a limited purpose," implicates the Fourth Amendment's guarantee against unreasonable searches and seizures. *Whren v. United States,* 517 U.S. 806, 809-810 (1996). As a general rule, the decision to stop an automobile is reasonable where the police have probable cause

---

[7] Blakely testified that when he asked if Mohamed "had a problem" with the officers searching the Toyota, Mohamed answered "no." That response caused Blakely to ask again: "No you don't have a problem?" Mohamed, according to Blakely, replied "go ahead." The recording of the stop at this juncture is poor as to Mohamed's last statement per Blakely. Nonetheless, Mohamed, in response to Blakely's request to search, clearly can be heard to state: "If you must." And while Mohamed's answer to the request for clarification cannot be heard, my review of the recording shows Mohamed nodding "no" to Blakely's clarification request (meaning – "no I do not have a problem"). Whether Mohamed nodded no or stated no (as Blakely testified), the clear import of Mohamed's actions were that he did not object to Blakely's search request. Accordingly, based on my review of the recording, I credit Blakely's interpretation of Mohamed's statements and actions.

[8] The grand jury has charged Mohamed with teaching or demonstrating the manufacture of a destructive device in violation of 18 U.S.C. § 842(p)(2)(A) (count one) and both Defendants with interstate transportation of explosive materials in violation of 18 U.S.C. § 842(a)(3)(A) (count two).

to believe that a traffic infraction has occurred. *Id.* at 810.[9]  Given that a traffic stop is only a limited form of seizure, the officer's actions during the stop must be "reasonably related in *scope* to the circumstances which justified the interference in the first place" and may not last "any longer than necessary to process traffic violation unless there is articulable suspicion of other illegal activity." *United States v. Purcell,* 236 F.3d 1274, 1277 (11th Cir. 2001) (emphasis in original and analyzing such stops per the standard announced in *Terry,* 392 U.S. at 20).  "Reasonable suspicion" means the officer must "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrants that intrusion."  *United States v. Boyce,* 351 F.3d 1102, 1107 (11th Cir. 2003) quoting *United States v. Tapia,* 912 F.2d 1367, 1370 (11th Cir. 1990).[10]

### 2. probable cause

Although the Defendants argue Blakely did not have probable cause to stop them for speeding, neither Defendant seriously counters the government's proof that they were speeding. They make vague arguments that when Blakely decided to pull them over the posted speed limit was 55 miles per hour and not 45 miles per hour, that Blakely inaccurately estimated their speed, and that Blakely, given his motivations, should not be believed as to this issue.  These arguments are not persuasive.  Blakely observed the Defendants before they reached the 55 miles per hour zone driving

---

[9]  As the government notes, however, and as the Defendants recognize, a lesser quantum of evidence than probable cause, namely "reasonable suspicion," can justify a traffic stop.  *See United States v. Chanthasouxat,* 342 F.3d 1271, 1275 (11th Cir. 2003) (recognizing that an officer's "reasonable suspicion" to believe a traffic violation has occurred justifies a stop per *Terry v. Ohio,* 392 U.S. 1 (1968)); *see also,* Wayne R. LaFave, The "Routine Traffic Stop" From Start to Finish: Too Much "Routine," Not Enough Fourth Amendment, 102 Mich. L. Rev. 1843, 1848 (2004) (noting that "most courts," abiding by *Terry*, assume "traffic stops as a class are permissible without probable cause if there exists reasonable suspicion, that is merely equivocal evidence").

[10]  Put another way, would the facts at the moment of the intrusion "warrant a man of reasonable caution in the belief that the action was appropriate?"  *Terry, supra,* 392 U.S. at 22.

in excess of the posted 45 miles per hour speed limit, and he decided to pull them over before he knew their ethnicities.  Moreover, his method of evaluating their speed by comparing it to his speed was sufficiently reliable to justify the stop.  *See United States v. Monzon-Gomez,* 244 F.3d 954, 959 n. 3 (11th Cir. 2007) (rejecting defendant's argument that officer needed "some type of radar device" to justify a traffic stop for speeding; for Fourth Amendment purposes, "the question is simply whether a law enforcement officer has sufficient cause to believe that a traffic law has been violated, not whether such a violation can be successfully prosecuted in court").[11]  Accordingly, I find Blakely had probable cause to believe the Defendants were speeding in violation of South Carolina law.

### 3.  reasonableness

In *Whren, supra,* the Supreme Court reaffirmed that an automobile stop is subject to the "constitutional imperative that it not be 'unreasonable' under the circumstances."  517 U.S. at 810. Defendants' argument, stripped to its core, is that Blakely acted unreasonably.  He should not have asked them questions about their travel plans; instead, Blakely should have ended the police-citizen encounter after he decided to issue them a warning for speeding.   In making these arguments, however, the Defendants largely ignore Blakely's rational observations, which the traffic recording objectively supports, and point to Blakely's ethnically charged comments.  Stated more accurately, the Defendants attack Blakely's motivation for asking about their travel and their consent to search their automobile.

Undoubtedly, Blakely's ethnically based assumptions did motivate him in part to investigate further, but that fact is irrelevant here.  *See United States v. Hernandez,* 418 F.3d 1206, 1210 n. 4

---

[11]  Per 11th Cr. R. 36-2, unpublished decisions like *Monzon-Gomez* are not considered binding precedent but may be cited as persuasive authority.

(2005) (citing *Whren, supra,* and rejecting defendant's argument that trooper intended to search the vehicle regardless of consent). In *Whren*, the Supreme Court held that it is not the searching officer's subjective intent that concerns the Fourth Amendment but whether that officer had probable cause to believe the defendant violated a traffic law:

> We think these cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved. We of course agree with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of the laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.

*See Whren,* 517 U.S. at 813.

Admittedly, the Defendants recognize *Whren's* holding; accordingly, they do not make the specific argument the defendant advanced in that case. Instead, the Defendants strenuously assert Blakely's crass remarks should weigh heavily against their maker's credibility. But that stance promotes a skewed view of the critical evidence – the dashboard recording of the stop. Namely, it overlooks the plainly objective evidence, which is available for all to see, and focuses on the subjective proof that the Supreme Court ruled out in *Whren.*[12] Furthermore, the Defendants' approach sidesteps the stop's limited duration, a critical constitutional factor.

This case is factually similar to a recently decided Eleventh Circuit case upholding a traffic-

---

[12]  In *Franks v. Delaware,* 438 U.S. 154 (1978), the Supreme Court held a defendant has the right under the Fourth Amendment to challenge the truthfulness of a police officer's sworn statements in support of a search warrant. As part of the *Franks's* analysis, the reviewing judge must set aside the disputed material and examine the remaining affidavit. If the redacted application supports a probable cause finding, the motion to suppress is due to be denied. While the instant case involves a warrantless search and *Franks* has no specific application, its analytical model has some relevance here. Examining the video for Blakely's articulated suspicions and measuring them for their objective reasonableness while redacting his crass comments follows a *Franks's* approach.

stop search.  In *United States v. Hernandez,* 418 F.3d 1206 (11th Cir. 2005), the court reversed the

district judge's decision granting the defendant's motion to suppress.  Like here, that stop lasted

seventeen minutes before the defendant consented to the officer's search; the officer, who had not

yet issued the warning citation to the driver, had developed reasonable suspicions based in part on

the defendant's answers to questions about travel plans (the decision to begin travel during severe

weather in Houston and to continue at night without stopping); and, the driver consented to the

trooper's search.  Importantly, the *Hernandez* panel underscored that "it is [the] unreasonable

extensions of the duration – not the scope of the conversation – that could render an otherwise

justified detention unreasonable for Fourth Amendment purposes."  418 F.3d at 1209 n. 3.  A

deputy's questions, even on a topic unrelated to the stop's initial purpose, does not constitute a

seizure "so long as it does not prolong the time reasonably required to complete that [initial]

mission." *Id.* quoting *Muehler v. Mena,* 544 U.S. 93, 101 (2005).  Not only did the *Hernandez* panel

find the trooper had sufficient reasonable suspicions to inquire further, it questioned whether a

traffic stop supported by probable cause and lasting only seventeen minutes could ever be

considered constitutionally unreasonable under the Fourth Amendment:

> Where at its inception a traffic stop is a valid one for violation of the law, we doubt
> that a resultant seizure of no more than seventeen minutes can ever be
> unconstitutional on account of its duration: the detention is too short.  By the way,
> no appellate decision has been called to our attention that has held such a short
> detention – linked to a legitimate stop – to be an unreasonable seizure under the
> Fourth Amendment on account of the stop's duration.

*See* 418 F.3d at 1212 n. 7.[13]

---

[13] *See also United States v. Ramirez,* 476 F.3d 1231 (11th Cir. 2007) (rejecting arguments
similar to the Defendants and reaffirming *Hernandez's* holding: it is the unreasonable extension
of the duration that implicates the Fourth Amendment – not the scope of the questions).

Blakely had good reason to ask the Defendants a few more questions. The Defendants traveled for a mile before stopping; they moved suspiciously when he approached them; their responses about the car's registration struck him oddly; and their Toyota bore a Florida tag, which he viewed as source point for drugs. And after questioning the Defendants a couple of minutes apiece about where they had been and where they were going, Blakely's increasing suspicions were warranted because the Defendants' story did not "make sense." Although they said they had been to various beaches, Blakely observed neither one appeared "sandy." It seemed implausible that someone would exit an interstate highway, avoid easily accessible gas stations at that exit, and drive fifty miles to buy gas at a Wal-Mart. Aside from these nonsensical accounts by the Defendants, Mohamed's admission about the "homemade rockets" gave Blakely even more reason to investigate further.

The Defendants real complaint is that Blakely asked one question too many after deciding to issue a warning citation. Admittedly, Blakely could have handed Mohamed a warning notice immediately after dispatch confirmed Mohamed's driving documents; however, he was not constitutionally required to do so. *Hernandez,* 418 F.3d at 1212 n. 7 ("We underline that the police are not constitutionally required to move at top speed or as fast as possible."). Moreover, the Defendants do not contend that Blakely acted abusively toward them at any time. On the contrary, Blakely presented a business-like demeanor to the Defendants and never revealed his ethnic animus (as suggested by his comments to his fellow officers) when he questioned them. In sum, Blakely's questioning of the Defendants about their travel itinerary did not unduly prolong the stop, and if it did to a slight degree, Blakely had adequate, articulable, and reasonable suspicions

for asking a few more questions.[14]

                  *4.  consent*

In the main, the Defendants challenge Mohamed's consent to the search on grounds that it was the product of an illegal detention.  *See Ramirez,* 476 F.3d at 1236 n. 10; *see also United States v. Simms,* 385 F.3d 1347, 1347, 1353 (11th Cir. 2004).  Given my findings above, that argument is untenable.  Aside from that approach, the Defendants argue that Mohamed "acquiesced" to a show of authority; therefore, he did not voluntarily consent to the search.  Notably, the Defendants did not present any evidence on this issue other than what can be readily observed from the video of the encounter.  Irrespective, that recording confirms Mohamed voluntarily consented to the search.[15]

The voluntariness inquiry is a factual one assessed from the perspective of the "totality of the circumstances."  *Schenckloth v. Bustamonte,* 412 U.S. 218, 227 (1973).   In evaluating the totality of the circumstances, a court should look at several "indicators": "the presence of coercive police procedures; the extent of the defendant's cooperation with the officer; the defendant's awareness of his right to refuse consent; the defendant's education and intelligence; and the defendant's belief that no incriminating evidence will be found."  *United States v. Simms,* 385 F.3d

---

[14]  Two other points are worth mentioning here.  The Defendants do not challenge the duration of the stop after Mohamed gave consent.  Once Mohamed gave consent, "the clock re-started" for purposes of evaluating the reasonableness of the duration of the intrusion.  *Hernandez,* 418 F.3d 1209-10.  I also note, as the *Hernandez* court observed, that there is no evidence in the record showing that seventeen minutes is significantly longer than the normal range for such stops.  Besides, "at a traffic stop, the police can occasionally pause for a moment to take a breath, to think about what they have seen and heard, and to ask a question or so."  418 F.3d at 1212 n. 7.

[15]  Frankly, Blakely did not need Mohamed's consent to search the Toyota.  Mohamed's admission that Blakely would find "homemade rockets" offered probable cause for the search because such items would likely be illegal contraband.

1347, 1355 (11th Cir.

2004) quoting *United States v. Purcell,* 236 F.3d 1274, 1281 (11th Cir. 2001).  All these factors

weigh against the Defendants.  Blakely and his backups did not display coercive or verbally abusive

tactics.  Ordering Mohamed to exit the Toyota and join the officers at its rear was appropriate.  *See*

*Pennsylvania v. Mimms,* 434 U.S. 106 (1977) (a police officer may as a matter of course order the

driver of a lawfully stopped car to exit his vehicle).  Importantly, when Mohamed acted as if he

assumed the officers were about to search him, Blakely refused and said, "only if you want us to."

That implied to Mohamed that Blakely needed his consent not only to search his person but also his

vehicle.  Besides, Blakely asked Mohamed, a Ph.D. candidate, three times if he consented to the

search.  Mohamed's answer, "if you must," with his gestures, body language (walking away from

the Toyota), and his belief that he had done nothing wrong, support a finding that he voluntarily

consented to the search.  *See  Purcell, supra* (officers did not "threaten force or violence" against

the defendant and were not "verbally abusive"; no indication from review of the videotape that the

defendant was "intimidated or browbeaten into consenting to the search"); *United States v. Hall*, 565

F.2d 917, 921 (5th Cir. 1978)[16] (defendant's stated belief that no incriminating evidence would be

found is a factor pointing to the validity of his consent; believing he had nothing to hide, he had

nothing to gain by refusing to consent to the search."); *United States v. Price*, 54 F.3d 342, 346 (7th

Cir. 1995) (defendant's response, "sure," to officer's question "do you mind if I take a look?"

supported finding of consent given the defendant's failure to protest officer's understanding of

---

[16]  The Eleventh Circuit in an *en banc* decision, *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

defendant's statement);  *United States v. McGann*, 1992 WL 14940 (10th Cir. 1992) (same).[17]

     *C.  Conclusion*

     For the reasons stated, I recommend the Defendants' motions to suppress (docs. 76, 102, and

106 ) be DENIED.

     IT IS SO REPORTED at Tampa, Florida on February 28, 2008.

MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE

**NOTICE TO PARTIES**

     Failure to file and serve written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date it is served on the parties shall bar an aggrieved party from a *de novo* determination by the District Court of issues covered in the report, and shall bar the party from attacking on appeal factual findings in the report accepted or adopted on appeal by the District Court except upon ground of plain error or manifest injustice.  28 U.S.C. § 636(b)(1)(C); Local Rule 6.02; *Nettles v. Wainright*, 677 F.2d 404 (5th Cir. 1982)(*en banc*).

cc:    Hon. Steven D. Merryday
        Counsel of Record

---

[17]  To the extent the Defendants argued at the suppression hearing that Blakely's search of Toyota and all its contents (including a folder containing travel documents) exceeded the scope of Mohamed's consent, I find such a claim to be without merit.  The standard for measuring the extent of an individual's consent under the Fourth Amendment is that of "objective" reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the individual searched?   Here, that would have included the envelope and the trunk.  *See Florida v. Jimeno,* 500 U.S. 248, 250-51 (1991) (finding consent to search car reasonably applied to contents of paper bag in the interior of the car).