UNITED STATES OF AMERICA
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

        v.                                     CASE NO. 8:07-cr-342-T-23MAP

AHMED ADELLATIF SHERIF MOHAMED
YOUSSEF SAMIR MEGAHED
_____/

**ORDER**

This cause is before the Court on Media General Operations, Inc., d/b/a WFLA-TV News Channel 8's motion to intervene and for access to judicial record (doc. 128) and WTSP-TV's motion for access (doc. 138).[1] WFLA seeks a copy of a video of the Defendants' traffic stop and questioning that was recorded by a camera mounted inside a police car. The video was admitted into evidence during a hearing on the Defendants' motion to suppress, and portions of the video were played in open court in the presence of the public and representatives of the media. WTSP's request is broader – in addition to the traffic stop video, WTSP seeks to "review and copy all documentary and physical evidence including" the videotapes admitted into evidence during the hearing on the Defendants' motion to suppress.[2] Defendant Ahmed Abdellatif Sherif Mohamed objects to the release of the traffic stop video on Sixth Amendment grounds. The United States

---

[1] WTSP has not formally moved to intervene, but the Court will construe its motion as a motion to intervene for the limited purpose of seeking access.

[2] In addition to the Government's exhibit 1, a CD containing a recording of the traffic stop and subsequent questioning that was introduced by the government, two more CDs were entered into evidence. Defendant Megahed's exhibit 7 contains four still photographs of the roadside where the Defendants were stopped, and also contains a video of the stretch of road in Goose Creek, S.C. where the Defendants were pulled over. Defendant Megahed's exhibit 9 contains footage of the arresting officers making two other traffic stops prior to the stop of the Defendants' vehicle, the traffic stop of the Defendants' vehicle, and the subsequent search of their vehicle.

and Defendant Youssef Samir Megahed are neutral on this issue.

There is no First Amendment right to copy and broadcast a video played in open court. *See Belo Broadcasting Corp. v. Clark*, 654 F.2d 423, 426–27 (5th Cir. 1981).[3] There is, however, a common-law right to inspect and copy judicial records. *See Newman v. Graddick*, 696 F.2d 796, 803 (11th Cir. 1983). The Eleventh Circuit has recognized that this common law right of access is "important if the public is to appreciate fully the often significant events at issue in public litigation and the workings of the legal system." *Id.* Nonetheless, this common law right is not absolute, and may be curtailed when it "interfere[s] with the administration of justice." *Id.*

In deciding whether to allow access, a court must consider the "historic presumption of access to judicial records." *Id.* Courts also look to "whether the records are sought for illegitimate purposes as to promote public scandal or gain unfair commercial advantage, whether access is likely to promote public understanding of historically significant events, . . . whether the press has already been permitted substantial access to the contents of the records, [and] whether the administrative difficulties in providing access would disrupt the progress of the trial." *United States v. Rosenthal*, 763 F.2d 1291, 1294–95 (11th Cir. 1985). A criminal defendant's right to a fair trial is the "*primary ultimate value* to be weighed on the non-access side of the balance." *Id.* at n.5 (emphasis added). The decision whether to allow inspection and copying of judicial records is left to the "sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 599 (1978).

---

[3] Decisions of the former Fifth Circuit rendered prior to October 1, 1981, are binding precedent on federal courts within the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

The television stations contend that the release of the video will facilitate public understanding of this proceeding, because the video is crucial evidence on the suppression issue in this case. Although WFLA acknowledges that a transcript has been made public, it contends that the video "conveys body language, tone of voice, and other elements that a mere written record lacks." *See* doc. 128 at 3. WFLA contends that the release of the tape will not violate the Defendants' trial rights because its content is focused on the actions of law enforcement: "[a] recording of racist comments from sheriff's deputies would hardly implicate these Defendants and in fact might tend to exculpate them." *See* doc. 128 at 4. Moreover, WFLA contends that prohibiting the release of the tape will not prevent jurors from learning the contents of the video, since the information was already disseminated to the public when the video was played in open court. Finally, WFLA argues that the jurors in this case could be instructed to set aside any knowledge they have gained from media accounts. In response, Defendant Mohamed argues that in addition to a recording of the traffic stop, the videotape contains a recording of his statements, and particularly in this "youtube" generation where statements could be edited and rebroadcast, the release of these statements could violate his right to a fair trial.

This Court's primary concern is protecting the Defendants' right to a fair trial. "It is better to err, if err we must, on the side of generosity in the protection of a defendant's right to a fair trial before an impartial jury." *See Belo*, 654 F.2d at 431. The media had access to the suppression hearing and was free to report on the portions of the tape that were played in open court. This case has already received substantial publicity. The release and broadcast of the tapes may have more of an inflammatory impact on the viewing public than a mere recounting of the testimony and evidence presented at the suppression hearing. *See In re NBC Universal, Inc.*, 426 F. Supp. 2d 49,

58 (E.D. N.Y. 2006) (recognizing that "[t]elevision indubitably has a much greater potential impact on jurors than print media," and finding that voir dire would be "an insufficient cure if a large segment of the citizens in this district are exposed to the prejudicial information").

The copying and broadcasting of the video at this time is particularly problematic, with the time for jury selection is soon approaching.  For this reason, *United States v. Trofimoff*, 2001 WL 1644230 (M.D. Fla. 2001), on which WFLA relies, is distinguishable.  At the time the *Trofimoff* court allowed the release of videotapes, the jury had already been selected and instructed not to watch any television coverage of the case or read any newspaper articles on the case.  *See Id.* at *2.  I recognize that some courts have allowed for the copying of videotapes, trusting that voir dire or a change of venue could address any prejudicial effect of the tape's broadcasting.  *See, e.g., United States v. Saunders*, 611 F. Supp. 45, 49 (S.D. Fla. 1985) (acknowledging that "broadcast of the tape will greatly increase the number of people with knowledge of the tape's content" and that "actually seeing the tape will create a stronger impression on people than merely hearing a news account of the content of the tape," but finding that the defendants' fair trial rights could be adequately protected by searching voir dire, or by "continuing the trial until public attention has subsided or changing the venue to a place less exposed to the publicity").  However, the decision whether to allow inspection and copying of judicial records is left to a trial court's sound discretion, and I find that the copying and broadcasting of the tapes at this sensitive time in the proceedings may inappropriately impact impaneling a jury.  Particularly because the Defendants are confined, I find it inappropriate to allow for the copying of a tape that may be used in a sensationalistic manner and could result in a delay of the trial. While the television stations' request to copy the traffic stop videos (Gov't ex. 1 and Defendant Megahed's ex. 9) must be

denied at this point in the proceedings to protect the Defendants' right to a fair trial, the copying of Defendant Megahed's exhibit 7 (the four photographs and the video of the area of the road where the stop occurred) do not raise the same concerns. Accordingly, WTSP's motion for access is granted in part as to those items.

This Court acknowledges that the release of the traffic stop tape may be appropriate later in the proceedings. *See United States v. Shenberg*, 817 F.Supp. 118, 120 (S.D. Fla. 1993) (allowing for the release of tapes admitted into evidence in criminal trial, but delaying the release until the jury concludes deliberations and reaches a verdict); *United States v. Eaves*, 685 F.Supp. 1243, 1245 (N.D. Ga. 1988) (holding that to protect the defendant's right to a fair trial, the portions of the tapes admitted into evidence at trial would be released to the media only after the close of evidence). However, "[t]he public's right of access to judicial material is not necessarily a right to instantaneous access; nor does the media's right to inspect such materials include a guarantee that they will be released when the effect of their dissemination would be the most sensational." *See Eaves*, 685 F.Supp. at 1245. Accordingly, it is hereby

ORDERED:

1. Motions to intervene are GRANTED.

2. Motion to access and copy the videos of the traffic stop (Gov't ex. 1, Def. Megahed's ex. 9) are denied.

3. WTSP's motion to access and copy the CD containing the photos and video of the roadside (Def. Megahed's ex. 7) and the documents admitted at the suppression hearing is granted.

4. The Clerk of Court will be able to provide copies of the documents admitted at the suppression hearing (Gov't ex.2-10, Def. Megahed's ex. 2, 10, and 11, and Def. Mohamed's ex. 1-2)

upon request at the usual fee.  The Clerk of Court will also provide a copy of the CD containing the photos and video of the roadside (Def. Megahed's ex. 7) upon request.

DONE AND ORDERED at Tampa, Florida on February 28, 2008.

*Mark A. Pizzo*
MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE

cc:     Counsel of Record